# United States Court of Appeals
## For the First Circuit

No. 18-1994

LUIS B. SÁNCHEZ,

Plaintiff, Appellee,

v.

JAMES J. FOLEY, individually and as a Massachusetts State Police
Officer; MICHAEL A. SWEET, individually and as a Massachusetts
State Police Officer; DANIEL T. PURTELL, individually and as a
Massachusetts State Police Officer,

Defendants, Appellants,

COMMONWEALTH OF MASSACHUSETTS,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Lynch, Selya, and Lipez,
Circuit Judges.

Joseph P. Kittredge, with whom Lorena Galvez and Rafanelli
Kittredge, P.C. were on brief, for appellant James J. Foley.
Daniel J. Moynihan, with whom Law Office of Daniel J.
Moynihan, P.C. was on brief, for appellant Michael A. Sweet.
David J. Officer, with whom David J. Officer, P.C. was on
brief, for appellant Daniel T. Purtell.
Héctor E. Piñeiro, with whom Robert A. Scott, Law Office of
Héctor Piñeiro, and Lizabel M. Negrón-Vargas were on brief, for
appellee.

August 18, 2020

**LIPEZ**, <u>**Circuit Judge**</u>.  After suffering a head injury at the Andover, Massachusetts State Police Barracks in January 2012, appellee Luis B. Sánchez filed a civil suit against the three troopers involved in his booking -- the appellants here -- alleging constitutional and state law violations.  A jury found all three officers liable for conspiracy to violate Sánchez's civil rights.  It also found one of them, Trooper James J. Foley, liable on several other claims, including the use of excessive force in violation of the Fourth Amendment.  The jury awarded Sánchez approximately $78,000.

Appellants now argue that the district court erred in denying their motions for judgment as a matter of law or, in the alternative, for a new trial or remittitur.  After careful review of the record, we affirm.

**I.**

**A.  Evidence Presented at Trial**

Sánchez's claims stem from his interactions with the troopers in the early morning hours of January 31, 2012, following his arrest by Trooper Foley for operating a vehicle while under the influence of alcohol on Route 28 in Lawrence, Massachusetts.[1]

_____

[1] Because appellants focus their arguments on the district court's denial of their motions for judgment as a matter of law, we present the facts primarily by construing the evidence in the light most favorable to the verdict.  See <u>Cortés-Reyes</u> v. <u>Salas-Quintana</u>, 608 F.3d 41, 45, 50 n.8 (1st Cir. 2010) (reciting evidence in the light most favorable to the verdict when reviewing

After transporting Sánchez to the Andover Police Barracks, Foley began the booking process. Because Sánchez speaks limited English and Foley does not speak Spanish, Foley called a translator to assist via speakerphone in advising Sánchez of his Miranda rights. The ensuing conversation among Foley, Sánchez, and the interpreter, as well as other conversations that occurred in the barracks before and after Sánchez was injured, were recorded by the interpreter service and later transcribed. The audiotape was admitted into evidence at trial.

After Foley notified Sánchez of his right to counsel, Sánchez invoked that right. Foley responded "[t]hat's fine" and continued with the Miranda warnings. When Foley had finished, he told the interpreter to ask Sánchez if he understood his rights, and Sánchez responded that he did not. Foley then asked "[w]hat doesn't he understand with those rights?" After Sánchez reiterated that he "d[id]n't understand, what [Foley was] telling [him]," the conversation was abruptly interrupted.

a district court's denial of motions for judgment as a matter of law and a new trial, when the appellants did not raise additional arguments in support of their motion for a new trial other than their contention that the verdict was against the clear weight of the evidence). Appellants do argue that the district court ignored the weight of the evidence in denying their motions for a new trial. To provide context and aid our analysis of those arguments, we also note some significant points of dispute between the parties.

- 4 -

The parties presented differing evidence at trial about the cause of that interruption. Sánchez testified that Foley, upset that Sánchez said he did not understand his rights, grabbed him by the neck and pushed him closer to the speakerphone connected to the interpreter. Sánchez stated that Foley used "a strong level of force," so much so that Sánchez "thought [Foley] was going to break [his] head against the desk right next to the phone." In response, Sánchez began screaming, addressing Foley as "friend" in Spanish, and told him that he could not "grab [him] like that." Sánchez testified that he was handcuffed during the entire episode.

Wilfredo De León, who had been arrested by Trooper Daniel T. Purtell for operating a vehicle without a license and was present in the booking room, also observed this initial confrontation between Foley and Sánchez. Like Sánchez, De León testified that Foley "grabbed [Sánchez] from the back of his neck to pull him closer to the phone" when Sánchez stated that he did not understand his rights. After that, Sánchez became agitated, telling Foley that he was hurting him and not to touch him in that way.

Foley and Trooper Michael A. Sweet offered a different version of the confrontation to the jury. According to Foley, Sánchez took a step back from where he was standing next to Foley in front of the speakerphone. Out of concern for a third arrestee, Kevin Waugh, who was sitting on a bench behind Sánchez, Foley "put

- 5 -

[his] hand out" behind Sánchez in an effort "to guide him back up towards the booking desk." But, according to Foley, Sánchez, who was not in handcuffs at this point, did not respond well to this contact. Foley testified that Sánchez "began to push back, flail his arms, and get resistant." Accordingly, Foley "grabbed [Sánchez's] arm and shoulder and collarbone area" and placed handcuffs on him.

Trooper Sweet, who was sitting on the other side of the booking desk and doing paperwork, echoed Foley's account. Although Sweet observed Foley put one hand on the back of Sánchez's shoulder and another hand on Sánchez's arm, he testified that he never saw Foley "grab [Sánchez] by the neck."[2]

Throughout this initial confrontation, the recording captured the following conversation:[3]

**Sánchez:** (Amigo) Friend . . .

**Foley:** Hey, hey, Come here . . .

**Sánchez:** You have to be respectful . . . you have to be respectful, you cannot grab me like that . . .

---

[2] Waugh, the arrestee sitting behind Sánchez, testified that Sánchez's arms were in the air at some point while he stood at the speakerphone. However, Waugh did not state whether Sánchez began backing up toward him, nor did he provide details about Foley's physical contact with Sánchez. He simply stated that, after Sánchez told Foley that he did not understand his rights, Foley told Sánchez he had to go in a cell and "grabbed him by the arm."

[3] This transcript includes the English translation of some conversation originally spoken and recorded in Spanish.

**Foley:**　　Hey.

**Sánchez:**　What you fucking?　You cannot do that.　You can't do that.　Tell him . . . of the lawyer.

**Foley:**　　Look, stop resisting.

**Sánchez:**　No.

**Foley:**　　Okay.

**Sánchez:**　You cannot force me.

**Foley:**　　Wait.

**Sánchez:**　He cannot force me . . . Why fucking problem . . . He cannot force me.　He cannot force me to do whatever you want . . . Okay, I am as gringo as you.　What you fucking . . . Record it . . . Hey he's mistreating/abusing me here . . . he's mistreating me.

There is no dispute that, at some point during this conversation, Troopers Sweet and Purtell joined Foley in restraining Sánchez.[4]　Sweet, moving from the other side of the booking desk, arrived first, taking hold of Sánchez's right side. Purtell, who had been sitting in an adjacent room doing paperwork for De León's arrest, came into the booking room when he heard a commotion and took hold of Sánchez's left arm.　Sánchez described

---

[4] Because there was inconsistent evidence about whether Sánchez was in handcuffs during Foley's explanation of his Miranda rights, the testimony differed as to whether the three troopers placed Sánchez in handcuffs at this point or simply took hold of him.

- 7 -

feeling severe pain when the officers took hold of his arms and testified that he "thought they were going to break [his] arms."

With Sánchez in handcuffs, the three troopers -- Sweet on the right, Purtell on the left, and Foley behind -- moved Sánchez across the booking room toward a doorway leading to a cellblock. The parties, again, presented conflicting evidence of what happened next -- and what caused Sánchez's injury.

Sánchez testified that, when the officers took hold of him, they "pushed [his] head all the way down," so that his hands were up in the air and he could not see where he was going. Shortly thereafter, he felt "a bang" and he "felt really heavy pain in [his] head." Because he could not see where he was going, he testified that he "didn't really know what had happened" to cause the pain he felt. But he testified, as he had during his deposition, that he had already crossed the booking room and was "crossing through the door" when he first felt an impact on his head. Sánchez testified that he then lost consciousness briefly. When he regained consciousness, he was moaning in pain and, although he was not sure whether he was in the cell itself or elsewhere, he could see a pool of blood on the ground.

As the recording reveals, there is a period of approximately twenty seconds when the troopers' voices can be heard but Sánchez's cannot. After that, Sánchez can be heard for approximately two minutes repeatedly saying "he killed me,"

identifying himself as "a good man," and asking for an ambulance.[5] Sánchez testified that he "was losing a lot of blood" and that, as he kept attempting to say in English that he needed an ambulance, the officers "were laughing" and "making fun."[6]

De León, who was handcuffed to a bench in the booking room next to the entrance to the cellblock, testified that, as the troopers moved Sánchez, he observed Sánchez's head strike the wooden doorjamb of the entrance. Sánchez presented expert

---

[5] During the period when Sánchez cannot be heard on the recording and he testified that he was unconscious, Foley says "get an ambulance." Although there is some incomprehensible speaking on the recording after Foley asks for an ambulance, Foley cannot be heard saying anything specifically for approximately two minutes as Sánchez was calling out for help.

[6] After Sánchez had been crying out for approximately a minute and a half, the following exchange occurred:

> **Sánchez:** Hey, 90, 91 please, 91 please, 91, 91 please. Oh my God, 91 please, hey 91. Ay, 91 please, no problema with you . . . 91, 91, they 91, 91, 91.
>
> **Foley:** What?
>
> **Sánchez:** 91, please 91, 91 please.
>
> **Foley:** 91 what?
>
> **Sánchez:** 911.
>
> **Foley:** 911 Yeah. It's coming.
>
> **Sánchez:** 911.
>
> **Foley:** They're coming.

Although there are incomprehensible words throughout the recording, laughter can be heard only at the end as the recording cuts off, approximately eight minutes after Sánchez entered the cellblock.

testimony by Dr. Alexander Chirkov that this impact could have caused the laceration to his head. Although De León testified that he could not see any blood or injuries to Sánchez's head from where he was sitting, and stated that he could not tell whether the officers intentionally struck Sánchez's head, he told the jury that he heard the noise of the impact. On the recording, Trooper Purtell is heard saying, "get out that door, oops." De León said that the three troopers "pulled [Sánchez] back a little bit" and then proceeded with him into the cellblock.

At that point, De León could no longer see Sánchez or the troopers from his location in the booking room. But he testified that he continued to hear an argument and then "really loud noise." De León stated that he "could only imagine" what was happening and "thought there were steps because it sounded like somebody just fell down the stairs." Sánchez then began to scream, "shouting at [De León], 'They're killing me, they're killing me.'"[7] From then on, De León testified, he "could just hear noises" and he did not "know what happened inside." According to De León, all three troopers were inside the cellblock when De León heard the "really loud noise" and "all the shouting."

---

[7] Although De León testified that Sánchez yelled "they're killing me," the recording reveals that Sánchez said "he killed me" and "this guy killed me" repeatedly.

At some point after Sánchez began screaming "he killed me," De León testified that Sánchez called out to him for help. Because De León was handcuffed to the bench in the booking room and also was scared that the officers might hurt him if he tried to intervene, he told Sánchez in Spanish that he could not do anything.[8]  The recording captured the following exchange:

> **De León:**  The ambulance is coming but you need to cooperate.  Please relax . . .
>
> **Sánchez:**  Yes, okay thank you.
>
> **De León**:  Don't worry, if you don't behave, they are going to treat you badly.  You have time to talk to them.
>
> **Sánchez:**  I don't want to stay here with them.
>
> **De León:**  You have to cooperate.
>
> **Sánchez:**  I don't want them to kill me in here.
>
> **De León:**  Yes, I understand but you have to cooperate with them so that nothing happens.
>
> **Sánchez:**  I am with you, I want to be with you.
>
> . . .
>
> **Sánchez:**  I want to be . . . I want to be with the partner.

---

[8] On the recording, Sánchez can be heard calling out to someone he addresses as "witness" and, at another point, as "Latino" and "Hispanic."  However, De León did not respond to Sánchez's cries until a trooper told him to let Sánchez know that an ambulance was coming.

**De León:** I understand but don't move, I am over here . . . don't move, okay.

**Sánchez:** (Ellos me partieron la [mierda]), they kicked the shit out of me.

**De León:** I understand but try to cooperate because the ambulance is on its way.

**Sánchez:** They hit me in the head.

**De León:** I know, I know but try to relax, if you don't behave they are not going to treat you well.

**Sánchez:** Take a picture of me, take a picture of me.

**De León:** I can't otherwise they will hit me hard as well.

When an ambulance arrived, the troopers brought Sánchez back into the booking room. De León told the jury that, at that point, he observed that Sánchez "had blood on his face and head," though De León still could not see the actual injury on top of Sánchez's head. De León testified that he did not remember seeing any trooper go to call an ambulance or bring a first aid kit.

Later that night, Foley reported to Sergeant Eric Bernstein, the supervisor who came to investigate Sánchez's injury, and who testified at trial, that the three troopers had together taken Sánchez into the cellblock and that Sánchez had sustained his head injury in the presence of all three troopers. At trial, however, all three troopers presented a different -- albeit, unified -- account of the evening. Each emphasized that

- 12 -

Sweet and Purtell never entered the cellblock and were not present when Sánchez sustained his head injury. As Sweet put it at trial, he "one hundred percent did not" enter the cellblock.

According to the testimony of the troopers, the doorway into the cellblock is narrow. Thus, when they reached that door with Sánchez, Sweet testified that he "hit the door frame on the right side" and he "popped off from Sánchez." Sweet testified that he "let go" of Sánchez at that point, because no one would have been able to get through the door if he kept his hold. Sweet recalled that, at the point that he (not Sánchez) hit the doorframe, Purtell said "oops," which can be heard on the recording. Purtell similarly testified that he hit the left side of the door, so he also let go of Sánchez at the threshold to the cellblock. According to the troopers, only Foley kept his grip on Sánchez and only the two of them entered into the cellblock.

Sweet and Purtell testified that they did not reassume their positions holding onto Sánchez once he had gone through the doorway or follow Foley into the cellblock. Instead, Purtell testified that he simply "turned around" at that point and "started walking back to finish [his] report." Although Sweet testified that he initially remained in the doorway to the cellblock where he could observe inside, he turned around once he heard Foley moving the cell door. Purtell and Sweet both stated that they

- 13 -

returned to assist Foley only when they heard Foley say "oh, he fell" and ask for an ambulance.

Thus, Foley was the only trooper who presented testimony about what happened inside the cellblock.[9]  He testified that Sánchez was "completely uncontrollable," and when they reached the entrance to the cell itself, Foley got stuck at the door.  Foley testified that Sánchez was "struggling" and "squirming," and Foley lost his grip on him.  At that point, Foley stated, Sánchez took several steps forward into the cell, lost his balance, and fell "head first into the toilet."  According to Foley, the impact of Sánchez's head on the toilet bowl rim caused the cut across the center of his head.  Dr. Jennifer Lipman, an expert witness for the troopers, testified that this fall caused the laceration to Sánchez's head.[10]

---

[9] The defense also called the desk officer on duty at the barracks, Trooper George Driscoll, to testify.  Based on his observation of a live-feed surveillance camera of the cellblock, he testified that he saw Sánchez fall "towards the back wall" of the cell as he was being placed into the cell by Foley.  Because of the angle of the camera, however, he testified that he could not see Sánchez hit his head.  He also acknowledged that he may have been watching up to twelve cameras on a single monitor and that there is no audio available on the surveillance feed.

[10] Waugh, the third arrestee in the barracks, whom the troopers called to testify, offered testimony that was not entirely consistent with the plaintiff's or defendants' accounts.  He stated that, as Sánchez was being moved toward the cellblock, his legs got "wobbly," he fell, and Foley then fell on top of Sánchez.  Although Waugh denied seeing Sánchez hit his head when he fell, he was impeached on cross examination by Sánchez's attorney with an

On the recording, Foley can be heard saying "oh, he fell." Although Foley acknowledged making the statement, he denied on cross examination that he did so only to protect himself -- that is, to provide an exculpatory explanation to the other arrestees in the booking room who might hear the loud sounds and screams coming from the cellblock, which might also be recorded. Approximately five seconds later on the recording, Foley can be heard saying "[s]tep up, step up" and, after another four seconds, "[g]et an ambulance." Approximately six seconds later, Sánchez can be heard for the first time moaning and saying "he killed me." Foley testified that Sánchez was conscious throughout the approximately twenty-second period in which he cannot be heard on the recording.

Sweet testified that, after hearing Foley say that Sánchez fell and that an ambulance was needed, he went into the bathroom and brought a stack of paper towels to Foley. Sweet also said that, eventually, he asked De León if he spoke Spanish, and he told him to let Sánchez know that an ambulance was coming. Purtell testified that he went to the desk area and asked another trooper to call an ambulance after he heard a bang and Foley's request for an ambulance. Upon entering the booking room, Purtell testified that he could see into the cellblock, where he saw

_____

affidavit he signed in 2012, which stated that Sánchez's head hit "the wall" next to the doorway to the cellblock.

Sánchez sitting in front of the cell with Foley applying pressure to Sánchez's head. Purtell, like Sweet, said that he asked De León to tell Sánchez in Spanish that an ambulance was on the way. Although at his deposition Purtell denied seeing blood on the floor of the cellblock, he admitted at trial, when confronted with photos showing a trail of blood between the cell and the cellblock, that there was blood on the floor.

Sánchez was treated at Lawrence General Hospital for his head laceration, which was approximately three inches long and required eleven staples. At trial, photographs of the wound were introduced into evidence. Sánchez testified that his scar continues to bother him and that his "head hurt constantly" after the incident. He also experienced "huge pain" in his back, neck, and shoulders. As a result of these injuries, he had follow-up treatment with his primary care doctors, attended physical therapy, and was placed on new medications. He introduced evidence of approximately $7,000 in medical expenses stemming from his injury. Finally, Sánchez testified that the incident had affected him "a lot" emotionally. When he sees the police now, he "tr[ies] to avoid them" and "panic[s]." Although he had been an "active and happy person" before the incident, he has "been down" since then.

**B.  Procedural History**

Sánchez filed this action in January 2015 alleging eight federal and state causes of action.  He proceeded to trial in October 2017 on five claims against all three officers:[11] (1) the use of excessive force in violation of the Fourth Amendment of the United States Constitution, actionable pursuant to 42 U.S.C. § 1983; (2) civil conspiracy to act in violation of the Fourth Amendment, also pursuant to section 1983; (3) assault and battery; (4) violation of the Massachusetts Civil Rights Act ("MCRA"); and (5) intentional infliction of emotional distress.  He pursued a sixth claim only against Foley for malicious prosecution.

During a four-day trial, as reflected in our account of the evidence, Sánchez and the three troopers testified, and each side also presented additional witnesses, including De León, Waugh, experts, and the supervisor who investigated the incident. At the close of Sánchez's case, the three troopers filed motions for judgment as a matter of law on the claims alleging conspiracy in violation of section 1983, intentional infliction of emotional distress, and violation of the MCRA.  See Fed. R. Civ. P. 50(a). Sánchez opposed those motions and also filed a motion for judgment

_____

[11] Sánchez voluntarily dismissed several claims prior to trial: a violation of the Massachusetts Tort Claims Act against the Commonwealth of Massachusetts; a claim of negligent infliction of emotional distress against the three troopers; and a claim for malicious prosecution against Sweet and Purtell.

- 17 -

as a matter of law.  The district court denied both plaintiff's and defendants' motions.  The parties renewed their motions for judgment as a matter of law at the close of the trial, and the district court again denied them.

The jury found Foley liable on all six claims and the other two troopers liable only on the civil rights conspiracy claim.  The jury awarded Sánchez $8,000 for his medical bills and $70,000 for pain and suffering, as well as pre-judgment interest.[12]

Each defendant moved for judgment as a matter of law, pursuant to Rule 50(b), or, in the alternative, for a new trial, pursuant to Rule 59(a), on each count for which he was found liable.  Foley also moved, pursuant to Rule 59(e), for remittitur.  The district court denied all of the motions, concluding that the trial evidence supported the verdicts.  The troopers filed this timely appeal.

## II.

### A.  Motions for Judgment as a Matter of Law

The appellants argue that the district court erred by denying their post-verdict motions for judgment as a matter of law on each of the counts for which they were found liable.  However, because all three troopers were found liable on the civil rights

---

[12] The verdict form specifically asked the jury whether it "award[ed] pre-judgment interest on the award of compensatory damages."  The court then specified the rate of pre-judgment interest on the judgment it entered.

- 18 -

conspiracy claim, and the damages can be upheld based on their liability on that claim alone, we consider only whether the district court erred in denying their motions for judgment as a matter of law with respect to that claim. Given our conclusion that there was no such error, we need not address Trooper Foley's arguments about the other claims for which the jury found him liable.

We review denials of post-verdict motions for judgment as a matter of law de novo. Blomquist v. Horned Dorset Primavera, Inc., 925 F.3d 541, 546 (1st Cir. 2019). "Nonetheless, our scrutiny of the jury verdict is tightly circumscribed[.]" Sailor Inc. F/V v. City of Rockland, 428 F.3d 348, 351 (1st Cir. 2005) (internal quotation marks omitted) (quoting Foisy v. Royal Maccabees Life Ins. Co., 356 F.3d 141, 145 (1st Cir. 2004)). We construe the facts in the light most favorable to the jury verdict and draw any inferences in favor of the non-movant. Blomquist, 925 F.3d at 546. "[W]e do not evaluate the credibility of the witnesses or the weight of the evidence." Id. (quoting Lama v. Borrás, 16 F.3d 473, 475 (1st Cir. 1994)). Ultimately, "[w]e must sustain the district court's denial of a Rule 50(b) motion for judgment as a matter of law unless the evidence . . . could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment." Id. (alterations in original) (quoting Lama, 16 F.3d at 477).

- 19 -

A civil rights conspiracy under section 1983 is

> commonly defined [as] "a combination of two or
> more persons acting in concert to commit an
> unlawful act, or to commit a lawful act by
> unlawful means, the principal element of which
> is an agreement between the parties to inflict
> a wrong against or injury upon another, and an
> overt act that results in damages."

Estate of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008) (quoting Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988)). To establish a civil rights conspiracy, a plaintiff must show "not only a conspiratorial agreement but also an actual abridgment of some federally-secured right." Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001). That is, if a jury finds that a plaintiff's civil rights were not actually violated by any defendant, the jury must also find that the defendants are not liable for a conspiracy to violate those same civil rights. See Earle, 850 F.2d at 845 (concluding that district court erred in directing verdict for defendant officer on a civil rights conspiracy claim because there was sufficient circumstantial evidence from which to infer a conspiratorial agreement but finding that error harmless because the jury found there had been no "illegal arrest, use of excessive force, [or] illegal searches").

Our requirement that there be "an actual deprivation of a right secured by the Constitution and laws" for a "conspirac[y to] be actionable under section 1983" reflects the fact that "[c]onspiracy is merely the mechanism by which to obtain the

- 20 -

necessary state action, or to impose liability on one defendant for the acts of the others performed in pursuance of the conspiracy." Landrigan v. City of Warwick, 628 F.2d 736, 742 (1st Cir. 1980) (internal citations omitted). In other words, a conspiracy under section 1983 permits a jury to hold co-conspirators liable for the damages flowing from a constitutional deprivation that all of the co-conspirators may not have personally carried out.

Sánchez asserts that the troopers conspired to deprive him of his right to be free from excessive force, in violation of the Fourth Amendment, thus making the troopers together liable for the injuries Sánchez sustained as a result of the excessive force Foley used. In effect, Sánchez contends that a jury could infer that the troopers engaged in a conspiracy to deprive Sánchez of his Fourth Amendment rights by participating in the prelude to Sánchez's injury -- thus communicating their assent to Foley's use of excessive force -- and implicitly agreeing before Foley injured Sánchez that they would cover it up later. According to this theory of the conspiracy claim, Foley used excessive force because he felt assured beforehand that Sweet and Purtell would cover for him. As Sweet and Purtell themselves put it in their brief, Foley "felt free to use excessive force without fear that his deeds would be exposed" because of the implicit agreement among the officers.

Appellants assert that the evidence was insufficient to permit a reasonable jury to conclude that Sánchez had established either an actual deprivation of his rights, namely the use of excessive force, or an agreement among the troopers to carry out that abridgment. They therefore contend that the district court erred in denying their motions for judgment as a matter of law on the civil rights conspiracy claim. We begin by considering the evidence relating to the agreement among the officers.

## 1. Agreement

To establish the first element of a section 1983 conspiracy -- an agreement among the members of the conspiracy -- the plaintiff must prove either the existence of a "single plan[,] the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences," or "[a]t the least" that "the parties decide[d] to act interdependently, each actor deciding to act only because he was aware that the others would act similarly." Aubin v. Fudala, 782 F.2d 280, 286 (1st Cir. 1983) (first alteration in original) (internal quotation marks omitted) (quoting Hampton v. Hanrahan, 600 F.2d 600, 621 (7th Cir. 1979), rev'd in part on other grounds, 446 U.S. 754 (1980)). While there must be sufficient evidence from which a reasonable jury can infer an agreement "without speculation and conjecture," Earle, 850 F.2d at 844 (quoting Aubin, 782 F.2d at 286), a plaintiff need not present direct evidence of

the agreement.  See id. at 845 (concluding that there was sufficient circumstantial evidence in the record for a reasonable jury to infer a conspiracy among three officers).  "[T]he agreement that rests at the heart of a conspiracy is seldom susceptible of direct proof: more often than not such an agreement must be inferred from all the circumstances."  Id. at 843.

We have previously held that officers involved solely in the cover up of another officer's assault and battery of a suspect, without any evidence of a conspiratorial agreement prior to the incident, cannot be held liable for the original tort through a civil rights conspiracy.  See Landrigan, 628 F.2d at 742 (rejecting plaintiff's theory that officers who helped cover up another officer's assault and battery of plaintiff were liable for the original tort, because they did not participate in the tort "and the conspiracy in which all were allegedly involved did not commence until after plaintiff's leg was broken"); see also Aubin, 782 F.2d at 286 (concluding that officers' after-the-fact acts to conceal a fellow officer's fatal shooting at the scene of a suspected burglary did not sufficiently demonstrate a conspiratorial agreement to deprive the shooting victim of his constitutional rights).  However, we have held that, for purposes of a civil rights conspiracy, a jury may reasonably infer the conspiratorial agreement from evidence of communication among officers before the alleged unlawful conduct occurred, coupled

with a story that a jury could conclude was fabricated to justify or cover up the original actions. See Santiago v. Fenton, 891 F.2d 373, 389 (1st Cir. 1989) (reversing directed verdict in favor of defendant officer because the jury could have reasonably inferred that the officers conspired to arrest the plaintiff, in violation of his Fourth Amendment rights, based on evidence of "discussions between the officers" before the arrest and the jury's possible inference that the officers had fabricated the reason for the arrest).

Sweet and Purtell contend that the record does not support a finding that they conspired with Foley before he used excessive force such that he could "fe[el] free to use excessive force without fear that his deeds would be exposed." They claim that the only evidence suggestive of an agreement among the officers is that all three testified consistently at trial that Foley alone was present in the cellblock when Sánchez was injured, even though Foley originally reported to the supervisor that all three officers were present, an account that aligned with De León's testimony. Sweet and Purtell argue that, even if the jury relied on the discrepancy in Foley's statements and on De León's testimony to conclude that all three officers entered the cellblock, and that Sánchez sustained his injury there, that would be an insufficient basis for inferring an agreement. In their view, this evidence shows, at best, Sweet and Purtell's "presence at the

commission of a culpable act" or involvement in efforts after the injury to cover up what Foley had done. They argue that, without evidence of a conversation among the officers or suspiciously consistent or inconsistent reports of the injury-causing incident, inferring a conspiracy is impermissibly speculative. As they put it, "[t]he mere fact that Foley testified inconsistently with an earlier report does not provide the basis for an inference that [the troopers] together reached an agreement to violate Sánchez's civil rights."

We disagree. Sweet and Purtell offer an overly myopic view of the evidence in depicting as unduly speculative the possibility of an agreement before Foley's use of excessive force. A jury could reasonably infer a conspiratorial agreement to deprive Sánchez of his Fourth Amendment rights based on Sweet and Purtell's direct aid to Foley in subduing Sánchez (whom the jury could have concluded was already in handcuffs) in the booking room, even as Sánchez was yelling "you have to be respectful" and "you cannot grab me like that"; Sánchez's head hitting the doorjamb, according to De León, while all three troopers were moving him; the incomprehensible conversation inside the cellblock, captured on the recording; the officers' comments ("oops" and "oh, he fell"), which the jury could have interpreted as efforts, in real time, to distort the other arrestees' perception of what the officers were doing to Sánchez; De León's testimony that the troopers all

- 25 -

remained in the cellblock as Sánchez was yelling "he killed me" and pleading that he is "a good man"; Sánchez's testimony that they laughed at him; and, finally, evidence of the troopers' efforts to fabricate a story that Sánchez had accidentally fallen with only one witness present.

The jury apparently concluded that Sweet and Purtell's actions did not themselves amount to excessive force, as evidenced by its finding against only Foley on the separate excessive force claim. Nevertheless, it could have reasonably inferred from these actions preceding Sánchez's injury that Sweet and Purtell had at least implicitly communicated their assent to Foley's actions and their intention to conceal them, thereby leaving Foley unrestrained in his interactions with Sánchez.

## 2. Deprivation of a Federally Secured Right: The Use of Excessive Force by Foley

Law enforcement "use of excessive force or violence . . . violates the victim's constitutional rights," Landrigan, 628 F.2d at 741-42, and thus satisfies the requirements that there be an overt act and an actual deprivation of civil rights to establish a civil rights conspiracy. To determine whether an officer has used excessive force, we consider "whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment." Graham v. Connor, 490 U.S. 386, 396 (1989). It is well established that the reasonableness test "requires a careful balancing of 'the

- 26 -

nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). In assessing reasonableness, we must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id.

Although Sánchez brought claims for excessive force against all three troopers, the jury found that only Foley used excessive force. The record in this case, viewed in the light most favorable to the verdict, amply supports that finding against Foley. De León testified that, after Foley "grabbed [Sánchez] by his neck," all three troopers grabbed onto Sánchez and moved him toward the cellblock. At that point, Sánchez was already in handcuffs. While the troopers were holding onto Sánchez, De León observed from his seat next to the entrance to the cellblock Sánchez's head hit the doorjamb. Sánchez's expert witness Dr. Chirkov testified that this impact could have caused the laceration to Sánchez's head. De León then saw the three officers enter the cellblock with Sánchez. Although De León could not see what the officers were doing inside, he heard an argument and then a loud noise. He next heard Sánchez repeatedly scream he "killed me" and

eventually ask De León for help.  When Sánchez was brought out of the cellblock, De León saw that he had blood on his face and head.

Sánchez testified that he felt a severe impact on his head as the officers moved him toward the cellblock.  Although Sánchez could not see where he was going and, thus, did not know what his head struck, he "felt really heavy pain in [his] head" and shortly thereafter lost consciousness.  On the recording, Sánchez can also be heard yelling from the cellblock to De León that "they kicked the shit out of me" and "[t]hey hit me in the head."

Based on this testimony, viewed in the light most favorable to the verdict, a jury could reasonably conclude that Foley caused the wound to Sánchez's head.  There are at least two points at which the jury could have found that Sánchez was injured. First, the jury could have found that Foley purposely struck Sánchez's head on the doorjamb as he was entering the cellblock, causing his injury.  Additionally, the jury could have concluded that Foley injured Sánchez inside the cellblock, based on, among other things, De León's testimony that there was a loud bang once the troopers and Sánchez were out of his sight, and Sánchez's screams and cries for help captured on the recording.[13]  Given that

_____

[13] Although Sánchez presented evidence to show that he could have sustained his injury when his head struck the doorjamb, he also acknowledged to the jury that, because he could not see where he was going and everything happened quickly, he was not sure what

Sánchez had been searched for weapons and was handcuffed both as he entered the cellblock and once he was inside, it was reasonable for the jury to conclude that Foley used excessive force in violation of Sánchez's Fourth Amendment rights.[14]

Foley attempts to undermine the validity of this excessive force finding by pointing to two asserted inconsistencies in the evidence. First, Foley asserts that De León's testimony on how Sánchez's head struck the doorjamb was inconsistent with the testimony of Sánchez's own expert, Dr. Chirkov, on the position of Sánchez's head if the doorjamb caused the injury. Specifically, Dr. Chirkov explained that Sánchez could have sustained the horizontal laceration on the top of his head from being shoved into a vertical portion of the doorjamb (where De León indicated Sánchez's head hit) only if his head was turned sideways at the point of the collision. Although Foley is correct that neither Sánchez nor De León testified that Sánchez's head was

---

he banged into and what caused the "heavy pain" to his head before he was knocked unconscious. Both theories of injury were also reflected in Sánchez's counsel's closing argument. Although he focused on the fact that Sánchez "was hit on the way into the [cellblock]," he also argued to the jury that "something else happen[ed] inside the cell room as well."

[14] Because the jury could reasonably conclude that Foley used excessive force at the entrance to the cellblock, once inside, or on both occasions, we need not address Foley's argument that there was insufficient evidence from which to conclude that his contact with Sánchez near the speakerphone before Sweet and Purtell arrived constituted excessive force.

so turned, neither witness was asked specifically about the position of Sánchez's head when it struck the doorjamb. Rather, De León testified generally that Sánchez's head was "down," meaning that his head was bent forward in front of his body. And Sánchez was not even sure what he struck when he first felt sharp pain, let alone precisely how his head was turned at that moment. Thus, contrary to Foley's argument, Dr. Chirkov's testimony was not incompatible with the other witnesses' testimony. In any event, this asserted inconsistency concerning Sánchez's collision with the doorjamb is immaterial in light of the evidence presented on the events inside the cellblock. Even if the jury did not believe that Sánchez's injury was caused by striking the doorjamb, the jury could readily infer, as we explained above, that Foley -- who admitted he was the lone officer holding Sánchez once inside the cellblock -- used excessive force inside the cellblock.

Second, Foley points to the change in Sánchez's description of what caused his injuries. He notes that Sánchez told medical personnel the day after the incident that the police had kicked him inside the cell, and he reiterated that report during his deposition. At trial, however, Sánchez presented evidence that his injury occurred when his head struck the doorjamb. Foley contends that, in light of this inconsistency, there was insufficient evidence from which a reasonable jury could conclude that he used excessive force. We disagree. Foley's

argument is, in effect, nothing more than a belated attack on Sánchez's credibility. It was up to the jury to weigh the credibility of Sánchez and the other witnesses, and we may not second guess such assessments when reviewing motions for judgment as a matter of law. See Blomquist, 925 F.3d at 546. Moreover, there was abundant evidence besides Sánchez's testimony -- namely the recording and De León's largely corroborating testimony -- from which the jury could have concluded that Foley used excessive force either at the entrance to the cellblock, or once inside, or on both occasions.

Finally, Foley makes an insufficiency argument because of the jury's finding that he alone used excessive force, but that all three troopers had conspired to violate Sánchez's civil rights. Foley argues, in effect, that a civil rights conspiracy among officers can exist only if each alleged co-conspirator is found to have personally violated a federally secured right of the plaintiff. Foley is incorrect. As we have explained, a civil rights conspiracy is "the mechanism . . . to impose liability on one defendant for the acts of the others performed in pursuance of th[at] conspiracy." Landrigan, 628 F.2d at 742. So long as there was an agreement among the three troopers to deprive Sánchez of his Fourth Amendment rights before the deprivation occurred, an overt act in furtherance of the conspiracy, and an actual deprivation of Sánchez's Fourth Amendment rights, all three

troopers were liable for that deprivation through the civil rights conspiracy claim, even if the jury concluded that they did not each personally use excessive force. Foley's argument therefore fails.

In sum, construing the evidence in the light most favorable to the verdict, there was sufficient evidence for a reasonable jury to find that the three troopers reached an agreement to deprive Sánchez of his Fourth Amendment rights and that Foley carried out that deprivation by using excessive force. The district court therefore correctly denied the troopers' motions for judgment as a matter of law on the civil rights conspiracy claim.

**B. Motions for a New Trial**

A district court may grant a motion for a new trial, pursuant to Rule 59(a), "only 'if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice.'" Thomas & Betts Corp. v. New Albertson's, Inc., 915 F.3d 36, 60 (1st Cir. 2019) (quoting Teixeira v. Town of Coventry, 882 F.3d 13, 16 (1st Cir. 2018)). Unlike its consideration of a motion for judgment as a matter of law, which requires the district court to construe the evidence in the light most favorable to the verdict, "a district court is free to independently weigh the evidence" when assessing whether to grant a motion for a new trial. See Jennings v. Jones, 587 F.3d 430,

436 (1st Cir. 2009); see also 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2806 (3d ed. 2020). Nonetheless, we have noted that, "[i]n general, conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial." Blomquist, 925 F.3d at 551 (quoting United States v. Garcia, 978 F.2d 746, 748 (1st Cir. 1992)). We review the denial of such a motion for an abuse of discretion. Id.

Appellants all assert that the district court abused its discretion in denying their motions for a new trial because the verdicts were against the weight of the evidence. Additionally, Sweet and Purtell contend that the district court erred as a matter of law in denying their motions for a new trial because it failed to apply the proper legal standard. Rather than "independently weigh" the evidence, as Rule 59 permits, see Jennings, 587 F.3d at 436, "the district court felt bound to draw all inferences in favor of the jury's verdict." In other words, Sweet and Purtell argue, the district court conflated their distinct motions for judgment as a matter of law and for a new trial and simply denied the latter because it had denied the former. We conclude otherwise.

In Purtell's motion for judgment as a matter of law or, in the alternative, a new trial, he articulated the relevant standard governing motions for new trials pursuant to Rule 59. Then, referencing the district court's charge to the jury, Purtell

argued that a new trial was warranted because "the jury failed to follow the trial court's instructions and the verdict it reached on [the civil rights conspiracy count] was against the weight of the evidence."  Foley's motion also stated the proper standard for evaluating motions for new trials, specifically noting that a new trial may be granted even when judgment as a matter of law may not.[15]  In his opposition to the motions, Sánchez similarly articulated the distinct and "less stringent" standard governing Rule 59 motions.

It is true that the district court, in a written decision, failed to restate the standard that governs a Rule 59 motion for a new trial.  Instead, it made a statement suggesting that it had construed the evidence in the light most favorable to the verdict when considering the troopers' motions for a new trial.  Specifically, the district court stated that "[b]ased upon the totality of evidence presented at trial and drawing all reasonable inferences in favor of the jury's verdict . . . there is no basis to reverse [the civil rights conspiracy] verdict or allow a new trial as to the conspiracy claim against the Defendants."

---

[15] Although Sweet captioned his motion as a renewed motion for judgment as a matter of law or, in the alternative, for a new trial, he did not cite Rule 59 or request a new trial in his motion and therefore did not discuss the standard that governs such motions.

We see this statement as nothing more than careless phrasing by the district court. The court's analysis reveals that it separately addressed Purtell's arguments for a new trial, underscoring that the court understood that the motions required distinct consideration as the appellants' motions laid out in their recitation of the differing standards. The court said, in direct response to Purtell's argument for a new trial, that "such verdict is not inconsistent with the jury instructions that the Court gave the jury." The court also stated that "there was evidence to support the jury's finding that all three defendants were liable for civil conspiracy." These comments persuade us that the court separately considered appellants' motions for a new trial under the proper standard.

We therefore conclude that the district court did not commit legal error in considering appellants' motions for a new trial and, furthermore, did not abuse its discretion in declining to order a new trial. This is not the "very unusual case" in which we will reverse a district court's denial of a motion pursuant to Rule 59, particularly in light of the credibility issues at the heart of this case. See Raiche v. Pietroski, 623 F.3d 30, 41 (1st Cir. 2010) (quoting Wagenmann v. Adams, 829 F.2d 196, 200 (1st Cir. 1987)).

## C. Remittitur

We review a district court's denial of a motion for remittitur under Rule 59(e) for abuse of discretion.  Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 14 (1st Cir. 2009).  "[A] party seeking remittitur 'bears a heavy burden of showing that an award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand.'"  Currier v. United Techs. Corp., 393 F.3d 246, 256 (1st Cir. 2004) (internal quotation marks omitted) (quoting Koster v. Trans. World Airlines, Inc., 181 F.2d 24, 34 (1st Cir. 1999)).  We will not upset a jury's damage award unless it "exceeds 'any rational appraisal or estimate of the damages that could be based on the evidence before the jury.'"  Smith v. Kmart Corp., 177 F.3d 19, 29 (1st Cir. 1999) (quoting Milone v. Moceri Family, Inc., 847 F.2d 35, 37 (1st Cir. 1988)).

Foley contends that, because Sánchez failed to establish that Foley's actions caused his head injury, the damages awarded are excessive.  However, we have already rejected Foley's arguments that he is not liable for that injury.  Because Foley advances no other arguments explaining why the damages awarded are "grossly excessive," we affirm the district court's denial of his motion for remittitur.

## III.

For the foregoing reasons, we <u>affirm</u> the district court's denial of appellants' motions for judgment as a matter of law and a new trial as well as Foley's motion for remittitur.

<u>So ordered.</u>