# United States Court of Appeals
## For the First Circuit

Nos. 19-2086, 19-2087

RYAN D. BURNETT,

Plaintiff, Appellee,

v.

OCEAN PROPERTIES, LTD.; AMERIPORT, LLC,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Howard, Chief Judge,
Lynch and Thompson, Circuit Judges.

Timothy J. Bryant, Jonathan G. Mermin, and Preti Flaherty
Beliveau & Pachios LLP, were on brief for appellant Ocean
Properties, Ltd.
Elizabeth A. Germani, Robert P. Hayes, and Germani Martemucci
& Hill were on brief for appellant AmeriPort, LLC.
Laura H. White, Danielle M. Quinlan, and White & Quinlan,
LLC, were on brief for appellee.
Melissa A. Hewey, Amy K. Olfene, Michael L. Buescher, and
Drummond Woodsum were on brief for HospitalityMaine, amicus
curiae.
Kristin L. Aiello was on brief for Disability Rights Maine,
amicus curiae.

February 2, 2021

**THOMPSON**, <u>**Circuit Judge**</u>. Appellee Ryan D. Burnett, who relies on a wheelchair for mobility, sued Appellants AmeriPort, LLC, and Ocean Properties, Ltd., for failing to accommodate his disability at work, as required under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and Maine Human Rights Act ("MHRA"), Me. Stat. tit. 5, § 4571 (1971). He prevailed and a jury awarded Burnett compensatory and punitive damages for his troubles. Over Appellants' protestations, the district court upheld the verdicts and entered judgment in Burnett's favor but remitted the punitive damages award. Appellants are here challenging the verdicts, amended judgment, and order denying their post-trial motions. After careful consideration, we affirm.

## BACKGROUND[1]

### The Parties

Ryan D. Burnett ("Burnett") was injured in a dirt bike accident and rendered paraplegic over twenty-three years ago. Starting in 2009, Burnett worked as an associate at a call center in South Portland, Maine, taking room reservations for forty-five hotels and resorts in the United States and Canada, all marketed under the umbrella term, "Ocean Properties Hotels, Resorts & Affiliates." Under 101 employees worked in the reservations

---

[1] We narrate the facts in the light most favorable to the jury's verdict and as relevant to this appeal. <u>See, e.g.</u>, <u>Bielunas v. F/V Misty Dawn, Inc.</u>, 621 F.3d 72, 74 (1st Cir. 2010).

department at the call center, whereas over 500 employees worked for the hotels and resorts under the Ocean Properties Hotels, Resorts & Affiliates umbrella. AmeriPort, LLC ("AmeriPort"), was Burnett's employer, and it held itself out publicly as "Ocean Properties Reservations," consistent with the umbrella moniker. Ocean Properties, Ltd. ("Ocean Properties"), was an entity that, as we discuss below, was interrelated to AmeriPort.

### Burnett's Request For An Accommodation

The call center was located in a golf clubhouse whose public entrance sported heavy, wooden doors that pulled outward and then automatically closed. Just beyond the entrance was a slight, downward slope that caused Burnett's wheelchair to roll backwards as the doors closed on him. As a result, Burnett needed to exert greater force as he struggled to enter.

On August 28, 2014, Burnett sent a message to Nick Robertshaw ("Robertshaw"), the acting office manager, requesting push-button, automatic doors at the public entrance, explaining that the "[d]oors are heavy and hard to hold open while I push myself [through] [without] them closing on me." Robertshaw did not respond to Burnett, but instead forwarded the message to his own supervisor, Lori Darsaoui ("Darsaoui"), and Darsaoui's supervisor that same day.

On September 10, 2014, Darsaoui e-mailed Mark Mooney ("Mooney"), who constructed the clubhouse and was responsible for

- 4 -

ensuring the building was up to code, asking "if the set of large wooden doors used to enter the lobby of the clubhouse are ADA compliant." Hearing no response, Darsaoui e-mailed Mooney again on September 30, 2014: "I wanted to follow up with you and see if you had found out if the doors here are ADA compliant[.] Please let me know as soon as you can." Mooney responded that same day with, "As constructed when the building was built, Yes." Darsaoui did not follow up on Mooney's e-mail and Burnett did not receive a response to his request.

One morning in October 2014, Burnett, while entering the clubhouse, injured his wrist (causing tingling in his hand) as he pulled open the heavy door and tried to quickly push himself inside. Burnett reported the incident to another supervisor who filed an incident report on his behalf, but again no one followed up with Burnett on his request for push-button, automatic doors.

In June 2015, Burnett filed a disability discrimination complaint with the Maine Human Rights Commission ("MHRC"). In a meeting with Burnett to discuss his MHRC complaint, Darsaoui told him she was not familiar with ADA compliance and, for whatever reason, no specific mention was made of Burnett's request for push-button, automatic doors. So even the filing of a complaint yielded Burnett no relief. On February 26, 2016, Burnett gave notice of his resignation, at which time the condition of the doors remained the same.

## The Trial

A three-day jury trial was held concerning the only trial-worthy issue which survived pre-trial dispositive motions to Burnett's suit:  whether Appellants violated the ADA and MHRA by failing to accommodate Burnett concerning the heavy wooden doors.[2] Burnett was the primary witness and he testified in support of his claim that Appellants never responded to his request for push-button, automatic doors, not "even as to why they could or could not or if they were or were not compliant."  Burnett recalled feeling "tired, frustrated, [and] angry" that he never heard a response to his request; he believed Appellants did not wish to accommodate him.  Another witness was Darsaoui, who was called by both Burnett and Appellants.  The third and final witness was Burnett's girlfriend, who testified further about Burnett's emotional distress which sometimes caused conflict in their relationship.  The jury heard testimony as narrated above in our background discussion.  Additionally, Appellants stipulated that replacing the doors was not an undue hardship and that Burnett had a disability, was qualified to do his job, and worked for

---

[2] The additional claims Burnett originally brought, but were tossed out, were failure to accommodate him regarding other incidents, disparate treatment, retaliation in violation of the ADA and MHRA, and violation of the Maine Whistleblower Protection Act.  Burnett did not appeal those rulings.

AmeriPort; the parties disputed whether Burnett also worked for Ocean Properties.[3]

Appellants also sought to call Mooney to testify that he tested the doors in December 2013 or January 2014 and found the doors ADA-compliant. However, Appellants conceded they did not disclose this information to Burnett until after the jury was selected and six days before trial; Appellants had previously disclosed only that the doors were tested when the building was constructed (as revealed in Mooney's e-mail to Darsaoui, which was timely provided to Burnett in discovery). Burnett claimed he was surprised and prejudiced by the late disclosure because he would have designated an expert and tested the doors himself. Siding with Burnett, the district court prohibited Appellants from inquiring about Mooney's 2013/2014 testing of the doors as a sanction for Appellants' failure to disclose or supplement during discovery. See Fed. R. Civ. P. 26(a), (e), 37(c). Although the ruling did not prevent Appellants from otherwise calling Mooney as a witness, Appellants opted not to do so.

Appellants moved for judgment as a matter of law at the close of Burnett's case in chief and again at the close of Appellants' case in chief, raising three total issues, which were that Burnett failed to show: (1) his requested accommodation was

_____

[3] At trial, Appellants were represented by the same counsel.

- 7 -

reasonable since he could perform the essential functions of his job; (2) Appellants acted with malice or reckless indifference towards him to support an award for punitive damages; and (3) Ocean Properties was his single or joint employer. See Fed. R. Civ. P. 50(a). The district court denied the motion on each ground. Then, during closing arguments, Burnett's counsel made two challenged comments, of which the first was objected to and the other was not: counsel (1) suggested that the jury "imagine" what life was like for Burnett having a disability in order to award him damages and then (2) suggested a ballpark damages figure.

## The Verdicts

The jury retired to deliberate with the following agreed-upon special verdict form:

> (1) Has Ryan Burnett proven it is more likely than not that Ocean Properties and/or AmeriPort failed to reasonably accommodate his disability?
> (2) What damages, if any, has Mr. Burnett proven more likely than not that he sustained as a result of Ocean Properties and/or AmeriPort's failure to reasonably accommodate his disability?
> (3) Was Ocean Properties an employer or joint employer of Mr. Burnett?
> (4) Were Ocean Properties and AmeriPort integrated employers of Ryan Burnett?
> (5) How many employees do you find Ryan Burnett's employer had when he worked for the employer?

In a chambers conference during deliberations, the district judge read to counsel a note from the jury that asked whether "both

- 8 -

questions 3 and 4 could be answered yes." The district judge said he believed both questions could be answered affirmatively and counsel for Burnett and Appellants agreed. After informing counsel that he would respond to the jury's note with "yes, both questions 3 and 4 could be answered yes," the district judge asked if there were any objections, and counsel for Burnett and Appellants replied that there was no objection.

The jury returned a verdict that answered questions 1, 3, and 4 affirmatively, found Burnett's employer had more than 500 employees (question 5), and awarded Burnett $150,000 in compensatory damages (question 2). No challenges to the verdict were raised.

Having found Appellants liable, the jury deliberated a second time to determine whether to award punitive damages. The jury returned a second verdict that found that Burnett proved Appellants acted intentionally or with reckless indifference and awarded him $500,000 in total punitive damages ($200,000 under the ADA and $300,000 under the MHRA).

**Post-Trial Motions**

After trial, Appellants renewed their motion for judgment as a matter of law raising the same grounds as before. They also moved for a new trial challenging the consistency of the first verdict regarding the employment relationship, the ruling excluding Mooney from testifying about the 2013/2014 testing of

the doors, and Burnett's counsel's closing arguments. Lastly, they moved to remit the total award to $50,000, the statutory limit recoverable from an employer with fewer than 101 employees, based on their claim that there was no evidence AmeriPort had over 100 employees and that Ocean Properties had any employees.[4] See 42 U.S.C. § 1981a(b)(3)(A); Me. Stat. tit. 5, § 4613(2)(B)(8)(e)(i) (2012).

The district court denied each motion. It did amend the judgment to accept the parties' stipulation reducing the total award from $650,000 to $500,000 and then remitted the punitive damages award from $500,000 to $350,000 (specifically, $125,000 under the ADA and $225,000 under the MHRA). It declined to remit further because Ocean Properties didn't prove it had fewer than 500 employees, making the maximum statutory limits (of $300,000 under the ADA and $500,000 under the MHRA) for employers with over 500 employees applicable instead. See 42 U.S.C. § 1981a(b)(3)(D); Me. Stat. tit. 5, § 4613(2)(B)(8)(e)(iv) (2012). This appeal followed.

---

[4] Appellants also argued below that the punitive damages award was duplicative (because Burnett was awarded punitive damages under the ADA and MHRA) and excessive, that the compensatory damages award was excessive because there was little evidence of emotional distress, and, alternatively, that the total award should be reduced to a de minimis figure of $10,000. Since Appellants abandoned these arguments on appeal, we do not address them.

Before us, Appellants assert that the district court's denial of their motions was wrong and warrants vacatur of the verdicts and judgment in their favor, or a new trial, or, if all else fails, remittitur.[5] We take each motion in turn, detailing additional facts as needed.

**Judgment As A Matter Of Law**

Appellants repeat here the same arguments they made below in their post-trial motions for judgment as a matter of law, which essentially are that Burnett failed to prove his case under the ADA and MHRA. Because the ADA and its Maine equivalent, the MHRA, have similar language, we discuss the statutes together. See generally Patten v. Wal-Mart Stores E., Inc., No. 00-213-PH, 2001 WL 631258, at *6 (D. Me. June 7, 2001) (noting that the language of the ADA and MHRA "is sufficiently similar to allow case law interpreting the federal statute to be applied to parallel claims under the state statute").

---

[5] Some arguments were briefed only by Ocean Properties, and others, only by AmeriPort, but Appellants tell us that they adopt one another's arguments. "In a case involving more than one appellant or appellee, . . . any number of appellants or appellees may join in a brief, and any party may adopt by reference a part of another's brief." Fed. R. App. P. 28(i). The adopted arguments must be "readily transferrable from the proponent's case to the adopter's case," however. United States v. David, 940 F.2d 722, 737 (1st Cir. 1991). Burnett didn't object to Appellants' adoption of each other's arguments and, therefore, we will treat Appellants' arguments as adequately adopted and explained relative to their respective claims on appeal.

## Standard of Review

We review de novo a district court's denial of a motion for judgment as a matter of law. Suero-Algarín v. CMT Hosp. Hima San Pablo Caguas, 957 F.3d 30, 37 (1st Cir. 2020). "Although we review the record as a whole, we construe facts in the light most favorable to the jury verdict, draw any inferences in favor of the non-movant [Burnett], and abstain from evaluating the credibility of the witnesses or the weight of the evidence." Id. We must affirm "unless the evidence . . . could lead a reasonable person to only one conclusion, namely, that [Appellants were] entitled to judgment." Id. (first alteration in original) (quoting Full Spectrum Software, Inc. v. Forte Automation Sys., Inc., 858 F.3d 666, 671 (1st Cir. 2017)).[6]

## Discussion

### 1. Employment Relationship

As mentioned, Appellants stipulated at trial that Burnett worked for Appellant, AmeriPort, but the battle below and before us is whether he also worked for Ocean Properties. On that front, Appellants argue that contrary to Burnett's assertions,

---

[6] At the outset, we note that Appellants' arguments mostly fail to account for our standard of review. Additionally, Appellants point the finger at Burnett for not following up on his request for push-button, automatic doors despite seeing Darsaoui regularly at work, but the burden is on the employer to respond to the request for an accommodation. See generally 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.2(o)(4); see also Me. Stat. tit. 5, § 4553(2)(E) (2019).

there was insufficient evidence at trial that Ocean Properties and AmeriPort were so interrelated to both be liable as Burnett's single integrated employer.

Therefore, before addressing Appellants' liability challenges, we first decide who might properly be on the hook. Appellants can be considered Burnett's single integrated employer if they are "two nominally separate companies" that are "so interrelated that they constitute a single employer subject to liability."  See Torres-Negrón v. Merck & Co., Inc., 488 F.3d 34, 40-41 (1st Cir. 2007) (applying single employer test to determine liability under Title VII and the ADA).  We consider the following four factors[7] to determine whether two or more entities count as a single employer under the ADA in the "widely recognized" integrated-enterprise test:  (i) "centralized control over labor relations"; (ii) "interrelation between operations"; (iii) "common management"; and (iv) "common ownership."[8]  Id. at 42 & n.8 (citing

---

[7] These factors were first developed to determine whether interrelated companies should be treated as one entity under the National Labor Relations Act, 29 U.S.C. § 164.  Romano v. U-Haul Int'l, 233 F.3d 655, 662 (1st Cir. 2000).

[8] Although we have identified various tests to determine whether a single employer exists in Title VII discrimination claims, see Romano, 233 F.3d at 665, we have yet to decide which test is applicable to determine whether an employer is liable under the single-employer theory in an ADA claim.  We will apply the integrated-enterprise test the parties applied in their briefs. See Torres-Negrón, 488 F.3d at 42 n.8 (1st Cir. 2007) (applying the integrated-enterprise test in an ADA claim).  Other circuits have applied this same test in ADA claims.  See, e.g., Tipton v.

- 13 -

Romano v. U-Haul Int'l, 233 F.3d 655, 662 (1st Cir. 2000)).  Not all four factors are necessary to establish a single employer relationship.  Id. at 42.  "Rather, the test should be applied flexibly, placing special emphasis on the control of employment decisions."  Id. (citing Romano, 233 F.3d at 666 (where we stated that "[w]e choose to follow the more flexible approach . . . which focuses on employment decisions, but only to the extent that the parent exerts an amount of participation [that] is sufficient and necessary to the total employment process, even absent total control or ultimate authority over hiring decisions") (internal quotation marks omitted))).  We evaluate these four factors one by one.

There is ample evidence of centralized control over labor relations, which examines control of employment decisions.  Romano, 233 F.3d at 666.  Burnett believed he worked for Ocean Properties.  He signed a probationary form indicating his acceptance "as a term of hire a 90-day probationary period with Ocean Properties" and a hiring statement indicating he was "an employee of Ocean Properties, Ltd., or affiliated companies."  He was issued a list of employment policies that displayed "Ocean

_____

Northrup Grumman Corp., 242 F. App'x 187, 190 (5th Cir. 2007); Bristol v. Bd. of Cnty. Comm'rs of Cnty. of Clear Creek, 312 F.3d 1213, 1220 (10th Cir. 2002); Parker v. Columbia Pictures Indus., 204 F.3d 326, 341 (2d Cir. 2000); Swallows v. Barnes & Noble Book Stores, Inc., 128 F.3d 990, 993-96 (6th Cir. 1997).

Properties Reservations Center Training Manual" on the bottom, left-hand corner and a certificate from "Ocean Properties, Ltd." for completing mandatory harassment training. Although Darsaoui testified that Burnett was hired to work for AmeriPort and that his probationary form was filled out incorrectly, we view the evidence in the light most favorable to the verdict and draw reasonable inferences in favor of Burnett. See Suero-Algarín, 957 F.3d at 37. Notwithstanding the evidence suggesting Burnett was hired and trained by Ocean Properties, other evidence shows his performance evaluation was conducted by AmeriPort and his supervision was managed by Darsaoui, AmeriPort's payroll administrator who was also in charge of human resources, scheduling, discipline, hiring, and firing at the clubhouse. But Darsaoui also hired reservation agents to work for Ocean Properties at the clubhouse.

As for employment compensation, there is evidence that Burnett received wages and benefits from both AmeriPort and Ocean Properties. He discussed "benefits" and "time off" with Darsaoui, he was on AmeriPort's payroll ledger, and his W-2 indicated his employer was AmeriPort, yet his paystubs listed his employer as "AmeriPort, LLC d/b/a [doing business as] Ocean PR Trust." Further, Burnett received a paycheck and stub from "OPL Central

Reservations"[9] and participated in a 401(k) plan through Ocean Properties. We find this compilation of facts is evidence of centralized control of labor relations. Compare Torres-Negrón, 488 F.3d at 43 (finding evidence of centralized control of labor relations where one entity paid plaintiff, provided her benefits, and had the power to terminate her, while the other entity exercised almost exclusive control over her day-to-day employment and had substantial influence over the decision to terminate her), with Engelhardt v. S.P. Richards Co., Inc., 472 F.3d 1, 7 (1st Cir. 2006) (finding no evidence of centralized control of labor relations in wrongful termination claim under the Family and Medical Leave Act where one entity "made its own, independent decisions with respect to labor relations" and did not defer to the other entity "in making hiring, firing, assignment, scheduling, or compensation decisions"). Accordingly, the first factor evinces a single integrated employer relationship.

The second factor -- the interrelation between operations -- evaluates whether Appellants "shared employees, services, records, office space, and equipment, commingled finances, and handling by the parent of subsidiary tasks such as payroll, books, and tax returns." Romano, 233 F.3d at 667 & n.7. Additional considerations under the interrelation of operations

_____

[9] We note that Darsaoui testified this was "not a paycheck stub, but it is a check and a check stub."

- 16 -

factor may include whether one entity "exerts considerable influence" over the other entity's "advertising and other decisions," as well as whether the former entity is directly involved in the latter entity's daily sales, marketing, and advertising decisions.  Id. at 666-67.

There is significant evidence of interrelation between operations at Ocean Properties and AmeriPort.  First, as discussed, there is evidence of shared personnel -- namely, Darsaoui.  Second, Appellants shared use of e-mail addresses.  Despite being AmeriPort employees, Darsaoui and Burnett had Ocean Properties e-mail addresses.  Third, Appellants shared documents and logos.  Darsaoui admitted that AmeriPort used Ocean Properties's employee handbook and department policies.  Moreover, an Ocean Properties advertisement Darsaoui co-authored and Burnett's training certificate signed by Darsaoui displayed the Ocean Properties logo, the same logo Burnett had seen used "multiple times around the office for different certificates or poster boards."  To Burnett's knowledge, AmeriPort did not have a separate logo.  The fact that Darsaoui contributed to the advertisement also evinces that AmeriPort was involved in Ocean Properties's advertising decisions.  Fourth, Appellants shared office space.  Darsaoui's office was in the clubhouse overlooking the call center where Burnett and the Ocean Properties reservation agents she hired would work.  Fifth, Appellants shared a corporate office, Portsmouth

Corporate Financial Services ("PCFSI"), in Portsmouth, New Hampshire. The payroll information Darsaoui processed for AmeriPort was submitted to PCFSI, where a copy of Burnett's probationary hire form was kept. Moreover, Burnett's Ocean Properties hiring statement listed PCFSI for all legal and corporate matters. There was evidence that AmeriPort and "OPL Central Reservations" had the same corporate office address. Overall, this is strong evidence of interrelation between operations. See, e.g., Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177, 1184 n.7 (10th Cir. 1999) ("Interrelation of operations is clear because the three entities shared a building, phone system, reception area, office equipment, accounting department, personnel manager, personnel handbook, and payroll accounts."). Further, Appellants performed substantially the same function and had the same purpose -- booking reservations and providing guest services for the same hotels and resorts. See Torres-Negrón, 488 F.3d at 42 (finding that two subsidiaries of the same parent company "perform[ed] substantially the same function" for purposes of the interrelation between operations factor).

Thus, the second factor -- review of the interrelation between the operations of AmeriPort and Ocean Properties -- also evinces a single integrated employer relationship. But see Engelhardt, 472 F.3d at 6-7 (finding no evidence of interrelation between operations where two entities had separate headquarters,

human resources, records, and record-keeping departments, separate worksites with distinct functions, and separate business purposes).

Darsaoui doing work for both AmeriPort and Ocean Properties is also evidence of the third factor -- common management -- which examines "whether the same individuals manage or supervise the different entities or whether the entities have common officers and boards of directors." Davis v. Ricketts, 765 F.3d 823, 828 (8th Cir. 2014) (citation omitted) (applying the integrated-enterprise test in a Title VII claim). But see Engelhardt, 472 F.3d at 6 (finding no evidence of common management where there was no common manager between two entities and no manager of one entity answered to an employee of the other entity).

Although there is little to no evidence of the fourth factor -- common ownership -- which looks at "whether one company owns the majority or all shares of the other and if the entities share common officers or directors," Davis, 765 F.3d at 828-29 (citation omitted), recall, as we discussed previously, that satisfying all four factors of the test is not necessary for Appellants to be viewed as a single integrated employer. See Torres-Negrón, 488 F.3d at 42. And, given the significant evidence submitted at trial as to the other factors which support the jury's finding, Appellants' challenge here fails.

Appellants also argue that there was insufficient evidence at trial that AmeriPort and Ocean Properties were Burnett's joint employers. However, having found there was sufficient evidence that Appellants were Burnett's single integrated employer, we have no reason to consider whether Appellants were also Burnett's joint employers.[10]  See, e.g., Burton v. Freescale Semiconductor, Inc., 798 F.3d 222, 229 n.4 (5th Cir. 2015) (finding "no occasion to consider" single employer status after holding that two entities were joint employers).  The single and joint employer theories are alternative theories of an employment relationship.  See Engelhardt, 472 F.3d at 4 n.2 (noting that whether a single or joint employer relationship exists depends on "whether the plaintiff seeks to impose liability on [his] legal employer or another entity"); Rivas v. Federacion de Asociaciones Pecuarias de P.R., 929 F.2d 814, 820 n.17 (1st Cir. 1991) ("[T]he 'joint employer' concept recognizes that the business entities involved are in fact separate but that they share or co-determine

_____

[10] Separately, Ocean Properties argues that if we conclude that Appellants were Burnett's joint employers but not his single integrated employer, Ocean Properties is entitled to judgment as a matter of law regarding punitive damages because there is no evidence that Ocean Properties (as opposed to AmeriPort) acted with malice or reckless indifference towards Burnett.  Ocean Properties first raised this claim in its Rule 50(b) motion and therefore the district court considered the claim waived.  We do not address this argument because we conclude that Appellants were Burnett's single integrated employer.

those conditions of employment." (quoting <u>N.L.R.B.</u> v. <u>Browning-Ferris Indus. of Pa., Inc.</u>, 691 F.2d 1117, 1123 (3d Cir. 1982))).

## 2. Reasonable Accommodation

Appellants contend that since the evidence showed Burnett was actually performing the duties of an associate -- indeed excelling at his job -- he did not need an accommodation and his requested accommodation was unreasonable. Burnett, who Appellants stipulated has a disability, has the right to a reasonable accommodation that would enable him to perform his job, unless Appellants can show that such accommodation would impose an undue hardship.[11] <u>See</u> 42 U.S.C. § 12112(b)(5); Me. Stat. tit. 5, § 4553(2)(E). To perform his job, Burnett must be able to perform the "essential function" or "fundamental job dut[y]" of the associate position. <u>See</u> <u>Ward</u> v. <u>Mass. Health Research Inst., Inc.</u>, 209 F.3d 29, 34 (1st Cir. 2000) (alteration in original) (quoting <u>Laurin</u> v. <u>Providence Hosp.</u>, 150 F.3d 52, 56-57 (1st Cir. 1998)); <u>see also</u> 42 U.S.C. § 12111(8); Me. Stat. tit. 5, § 4553(8-D). An "essential function" can encompass more than the "technical skills and experience" the position requires. <u>Ward</u>, 209 F.3d at

---

[11] An accommodation poses an "undue hardship" if it requires significant difficulty, financial or otherwise. <u>See</u> 29 C.F.R. § 1630.2(p)(1); Me. Rev. Stat. Ann. tit. 5, § 4553(9-B). Because Appellants stipulated that replacing the doors was not an undue hardship and do not argue otherwise on appeal, we do not discuss whether Appellants would have met their statutory burden of proving undue hardship.

34 (quoting <u>Laurin</u>, 150 F.3d at 57, 59 n.6); <u>see also</u> <u>Grenier</u> v. <u>Cyanamid Plastics, Inc.</u>, 70 F.3d 667, 674 (1st Cir. 1995) (citing cases illustrating "essential functions" beyond the "job-related functions").[12]

There was sufficient evidence that Burnett needed an accommodation and that his requested accommodation was reasonable. Burnett testified that, daily, he experienced difficulty entering the clubhouse and once injured his wrist when doing so. The fact that Burnett was able to enter the clubhouse (at the risk of bodily injury) despite this difficulty and to perform the duties of an associate once inside does not necessarily mean he did not require an accommodation or that his requested accommodation was unreasonable, as Appellants claim. A "'reasonable accommodation' may include . . . making existing facilities used by employees readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12111(9)(A); <u>see also</u> Me. Stat. tit. 5, § 4553(9-A)(A). Moreover, the Supreme Court clarified in <u>U.S.</u>

---

[12] Generally, an employer is required to engage in an interactive process with the employee with a disability to identify a reasonable accommodation. <u>See generally</u> <u>Kezer</u> v. <u>Cent. Me. Med. Ctr.</u>, 40 A.3d 955, 963-64 (Me. 2012) (citing Me. Stat. tit. 5, § 4613(2)(B)(8)(b)); 29 C.F.R. § 1630.2(o)(3). Burnett argues that Appellants failed to engage in such a process with him. However, as Appellants correctly note in their reply, the jury did not make any findings related to the interactive process, nor do Appellants raise any challenges to the interactive process in their opening briefs. Therefore, we do not address whether Appellants were required to participate in the interactive process and if they did so.

Airways, Inc. v. Barnett that "[t]he [ADA] requires preferences in the form of 'reasonable accommodations' that are needed for those with disabilities to obtain the same workplace opportunities that those without disabilities automatically enjoy." 535 U.S. 391, 397 (2002). Viewing the evidence in the light most favorable to the verdict, see Suero-Algarín, 957 F.3d at 37, the evidence presented shows that the existing doors were not "readily accessible to and usable by" Burnett and that an accommodation was necessary for Burnett to reach a level playing field as an employee without a disability.[13] Based on this evidence, a reasonable jury could conclude that Appellants did in fact fail to reasonably accommodate Burnett's disability.

### 3. Malice/Reckless Indifference

Appellants claim Burnett shouldn't have been awarded punitive damages because there was insufficient evidence that they acted with malice or reckless indifference towards him. Burnett is entitled to punitive damages if he can show Appellants "engaged in a discriminatory practice . . . with malice or with reckless

_____

[13] Citing Ward, 209 F.3d at 33, Appellants claim that to determine whether a reasonable accommodation is necessary, the first step is whether the employee can perform the essential functions of the job and, if he cannot, then the second step is whether any reasonable accommodation will enable him to perform the essential functions. Appellants' reliance on Ward is misplaced. We applied this two-step test in Ward to determine whether the plaintiff was a "qualified individual" within the meaning of the ADA, id. at 33-34, not whether he needed a reasonable accommodation.

indifference to [his] . . . rights."  42 U.S.C. § 1981a(b)(1); see also Me. Stat. tit. 5, § 4613(2)(B)(8)(c).  "[M]alice and reckless indifference concern, not the employer's awareness that it is discriminating, but the employer's knowledge that it is acting in violation of federal law."  McDonough v. City of Quincy, 452 F.3d 8, 24 (1st Cir. 2006); see also Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999) ("[A]n employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages."); Kopenga v. Davric Me. Corp., 727 A.2d 906, 910 (Me. 1999) (noting that the MHRA's "language is borrowed directly from federal law").  Burnett must prove his entitlement to punitive damages by a preponderance of the evidence under the ADA, see generally Jacques v. Clean-Up Grp., Inc., 96 F.3d 506, 511 (1st Cir. 1996) (noting that a plaintiff must prove by a preponderance of the evidence the prima facie elements of disability discrimination under the ADA), and by the higher clear-and-convincing-evidence standard under the MHRA, Haverly-Johndro v. Bath & Body Works, LLC, No. 1:13-CV-00108-JDL, 2014 WL 2944007, at *7 (D. Me. June 30, 2014) (citing Batchelder v. Realty Res. Hosp., LLC, 914 A.2d 1116, 1124 (Me. 2007)).  Appellants bear the burden of proving they acted in good faith to comply with the law.  See generally Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 64 (1st Cir. 2005) (citing Romano, 233 F.3d at 670).

There is sufficient evidence that Appellants acted with reckless indifference towards Burnett's rights. Appellants failed to follow up with Burnett three times regarding his accommodation request: (1) after Burnett sent Robertshaw a request for an accommodation in August 2014; (2) after Burnett reported his wrist injury in October 2014; and (3) after Burnett filed an MHRC complaint in June 2015 and met with Darsaoui thereafter to discuss it. The last two incidents served as reminders to Appellants of Burnett's pending request. And as a result of Appellants' failure to respond to his request, Burnett experienced difficulty with the doors every day for months until he resigned. Based on this evidence, a reasonable jury could conclude that Appellants acted "in the face of a perceived risk that its actions will violate federal law." Kolstad, 527 U.S. at 536. See generally Arrieta-Colon v. Wal-Mart P.R., Inc., 434 F.3d 75, 89-90 (1st Cir. 2006) (holding that award of punitive damages was warranted in ADA claim based on hostile work environment where evidence showed that former employee reported harassment by his co-workers to several supervisors, all of whom failed to take any action, showing reckless indifference to employee's rights); Marrero v. Goya of P.R., Inc., 304 F.3d 7, 29-30 (1st Cir. 2002) (concluding that evidence that supervisors failed to act on employee's reports of sexual harassment and that employer failed to take action until after employee filed EEOC complaint supported jury's finding of

reckless indifference); Bubar v. NorDx, No. 2:16-cv-00201-JHR, 2018 WL 715329, at *9 (D. Me. Feb. 4, 2018), appeal dismissed, No. 18-1201, 2018 WL 4215609 (1st Cir. Sept. 4, 2018) (declining to strike jury's punitive damages award under Maine law given evidence of employer's repeated failure to respond to employee's complaints of harassment and rejecting employer's good-faith compliance defense absent evidence it implemented its written anti-discrimination policies).

Appellants rely on testimony by Burnett (as he believed) and Darsaoui that Darsaoui did not act with malice or reckless indifference, but other evidence points to the contrary. The record shows that Appellants never responded to Burnett's request for an accommodation. Although Darsaoui testified that her "normal practice" was to follow up with an employee "verbally" and recalled "discussions going on regarding the doors," she admitted she could not "recall having a specific conversation" with Burnett about his request.[14] When viewing the evidence in the light most favorable to the verdict and drawing inferences in Burnett's favor, see Suero-Algarín, 957 F.3d at 37, a reasonable jury could conclude that Appellants did in fact fail to follow up with Burnett on his request, thereby acting with reckless indifference.

---

[14] We note that Darsaoui's testimony about her "normal practice" contradicts her testimony and Burnett's testimony that during their meeting to discuss the MHRC complaint, Darsaoui acknowledged she had no specific knowledge of ADA compliance.

Appellants insist that they acted in good faith. As evidence of their "good faith efforts" to comply with the law, Appellants point to their anti-discrimination policy, Darsaoui's admission that she was aware of her obligation to address every request for an accommodation, her "consult[ation] with others to determine the extent to which the company should investigate the requested accommodation," her communication with Mooney regarding whether the doors were ADA-compliant, and her understanding, based on Mooney's response, that the doors were in fact ADA-compliant. A showing of good faith to comply with the law, however, requires more than "lip service." Arrieta-Colon, 434 F.3d at 89-90 (rejecting employer's claim that "any evidence of a good-faith effort could shield it from liability" and instead "requir[ing] a finding of a good-faith effort to comply with the law").

These examples are unavailing. First, Burnett's employee handbook included an equal employment opportunity statement[15] and an open-door policy.[16] Burnett followed the open-

---

[15] The statement read, in part: "It is the policy and practice of this Hotel to provide equal employment opportunities to all Associates of the Hotel without regard to race, color, age, religion, sex, creed, ancestry, sexual orientation, national origin, familial status, disability, or any other legally protected status."

[16] The policy directed associates to "bring . . . to the attention of either your supervisor, the general manager or to a member of our corporate staff" questions or suggestions about improving job performance, "guest services," or "the overall operation of the hotel."

- 27 -

door policy by contacting (acting office manager) Robertshaw to request an accommodation, but to no avail from Robertshaw or any corporate superiors. As such, a written policy, without more, "is insufficient to insulate an employer from punitive damages liability." Romano, 233 F.3d at 670 (rejecting employer's good-faith defense absent evidence that employees were periodically trained on anti-discrimination policies, that supervisors were trained to prevent discrimination, or that anti-discrimination policies were successfully followed). Second, Darsaoui's admission of her obligation to take seriously a request for an accommodation could lead a reasonable jury to conclude that Appellants knew their failure to respond to Burnett's request was a violation of the law. See Rodriguez-Torres, 399 F.3d at 64-65 (concluding that supervisor's testimony that he was aware of signs posted throughout the facility regarding discrimination laws and employees' rights could lead a reasonable jury to conclude he understood that firing an employee on the basis of gender violated federal law); see also E.E.O.C. v. Fed. Express Corp., 513 F.3d 360, 375-76 (4th Cir. 2008) (holding that evidence that senior employees knew of disabled employee's requested accommodation and were put on notice of his filing of a disability discrimination charge with the EEOC, yet didn't take any steps to ensure his supervisor consulted the company's human resources manual on the ADA and its reasonable accommodations requirement or was

adequately prepared to implement the company's ADA compliance policy, was sufficient to support jury's finding that the employer failed to engage in good-faith efforts to implement its ADA-compliance policy requiring reasonable accommodations for disabled employees, thus justifying a punitive damages award).   Finally, after confirming with Mooney that the doors were ADA-compliant "when the building was built," Darsaoui did not inquire further into the date the building was built and whether the doors remained compliant at the time of Burnett's request.  Ultimately, Burnett's pleas simply went unanswered.  In sum, there was adequate evidence that Appellants acted with reckless indifference to support the award for punitive damages.[17]

In conclusion, all three of Appellants' judgment-as-a-matter-of-law claims must fail.

_____

[17] Appellants distinguish this case from two cases that are inapposite.  See Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 148-49 (1st Cir. 2009) (finding no evidence of reckless indifference where employer deemed employee's requested accommodations unreasonable but "consideration was given -- whether or not correctly, but consideration was given -- by the [employer] to the relevant factors"); Marcano-Rivera v. Pueblo Int'l, Inc., 232 F.3d 245, 254 (1st Cir. 2000) ("[Employee and her husband] have not identified any facts that would support an award of punitive damages . . . [and] [t]he record is replete . . . with evidence that [the employer] instituted policies prohibiting any type of discrimination, trained its personnel to ensure equal treatment of employees with disabilities, and took good faith efforts to comply with the ADA.").

## New Trial

On appeal, Appellants repeat three of the four claims of error they raised below and, to refresh, these are: (1) the first verdict regarding the employment relationship was inconsistent; (2) they were prejudiced by the district court's ruling excluding Mooney from testifying about the 2013/2014 testing of the doors; and (3) they were prejudiced by two improper comments made by Burnett's counsel during closing arguments. Burnett tells us the district court's rulings were correct. We discuss each alleged claim of error in turn.

## Standard of Review

A district court may grant a new trial "only if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice." Sánchez v. Foley, 972 F.3d 1, 16 (1st Cir. 2020) (internal quotation marks and citation omitted); see also Fed. R. Civ. P. 59(a). We review the denial of such a motion for abuse of discretion. See Rodríguez v. Señor Frog's de la Isla, Inc., 642 F.3d 28, 37 (1st Cir. 2011). In contrast, we review unpreserved claims for plain error, meaning Appellants must show "(1) error which (2) is so clear that a trial judge should act even without an objection and which (3) affects the [appellants'] substantial rights." Bielunas, 621 F.3d at 78. The third prong requires a "reasonable probability that, but for the alleged error, the verdict would have been different."

Teixeira v. Town of Coventry ex rel. Przybyla, 882 F.3d 13, 19 (1st Cir. 2018). We apply the plain error doctrine "stringently" in civil cases and "will reverse only if the error [also (4)] 'seriously affected the fairness, integrity or public reputation of the judicial proceedings.'" Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion, 345 F.3d 15, 22-23 (1st Cir. 2003) (quoting Smith v. Kmart Corp., 177 F.3d 19, 26 (1st Cir. 1999)).

**Discussion**

**1.  Inconsistent Verdict**

Appellants' first claim of error is that the verdict that Ocean Properties and AmeriPort were Burnett's single integrated employer and joint employers was inconsistent because Ocean Properties could only be liable under a single-integrated-employer theory or joint-employer theory, but not both.[18]  "This Circuit follows the iron-clad rule that a party 'waives [the issue

---

[18] A quick pause to note that the district court found that Appellants' reading of the verdict mischaracterized the special verdict form.  The court stated:
  In fact, question three of the verdict form states: "[w]as Ocean Properties an employer or joint employer of Mr. Burnett?"  In response, the jury checked "yes." Question four states: "[w]ere Ocean Properties and AmeriPort integrated employers of Ryan Burnett?"  The jury checked "yes."  In the Court's view, therefore, it is not clear based on the special interrogatories, agreed to by the parties, whether the jury found Ocean Properties to be an employer, a joint employer, an integrated employer, or all three.

- 31 -

of] inconsistency if it fails to object after the verdict is read and before the jury is dismissed.'"  Wennik v. Polygram Grp. Distrib., Inc., 304 F.3d 123, 130 (1st Cir. 2002) (alteration in original) (quoting Toucet v. Mar. Overseas Corp., 991 F.2d 5, 8 (1st Cir. 1993)).  "This is because the 'only efficient time to cure the problem is after the jury announces its results and before it is excused, and it is the responsibility of counsel to make timely objection.'"  Toucet, 991 F.2d at 8 (quoting Austin v. Lincoln Equip. Assocs., 888 F.2d 934, 939 (1st Cir. 1989)).

When the jury returned with affirmative answers to questions 3 and 4 on the special verdict form, Appellants had "both an opportunity and an obligation" to raise their claim that the verdict was allegedly inconsistent yet failed to do so.  See Trainor v. HEI Hosp., LLC, 699 F.3d 19, 33–34 (1st Cir. 2012) (deeming inconsistent verdict claim waived where party failed to object when jury returned verdict); Torres-Arroyo v. Rullán, 436 F.3d 1, 6 (1st Cir. 2006) (deeming inconsistent verdict claim waived where party failed to object after jury announced verdict but before jury was discharged).  Ocean Properties does not dispute that it did not raise this argument before the jury was discharged. Therefore, Ocean Properties has waived its right to challenge the alleged inconsistency of the verdict.  See Uphoff Figueroa v. Alejandro, 597 F.3d 423, 435 n.15 (1st Cir. 2010) (deeming

inconsistent verdict claim waived where appellant "does not dispute that he did not object before the jury was discharged").

Indeed, Ocean Properties engaged in a second waiver when it did not object to the district judge's proposed response to the jurors' note regarding jury interrogatory questions 3 and 4. See Toucet, 991 F.2d at 9 (noting that appellant had "ample opportunity to 'portend possible verdict inconsistency'" and "should have been alerted by the use of the special verdict form alone" (quoting Austin, 888 F.2d at 939)). If Ocean Properties thought there was any inconsistency, it should have spoken up then.[19]

## 2.    Mooney's Testimony

Appellants' second claim of error is the district court's ruling excluding Mooney from testifying about the 2013/2014 testing of the doors because Mooney had already been listed as a trial witness in discovery and his testimony was essential to Appellants' defense that they reasonably accommodated

---

[19] Even if we were to bypass waiver and review for plain error, Ocean Properties still would not prevail. See Int'l Floor Crafts, Inc. v. Dziemit, 420 F. App'x 6, 14 (1st Cir. 2011) (finding inconsistent verdict argument waived for failure to timely object and, at most, reviewing only for plain error). Ocean Properties cannot show any error seriously affected the fairness, integrity, or public reputation of the trial when the record shows it fully participated in discussions concerning the verdict form, see supra note 18 (noting the parties agreed to the special interrogatories), and, after the first verdict was reached, the jury had not yet been discharged, which means Ocean Properties was afforded ample opportunity to challenge the verdict. Beyond jury deliberations, the record shows the trial was conducted fairly and the district judge was impartial.

Burnett because the doors were ADA-compliant. "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure . . . is harmless."[20] Fed. R. Civ. P. 37(c)(1). When reviewing a district court's decision to exclude evidence as a Rule 37 sanction, we consider various factors, through an abuse of discretion lens, see Lawes v. CSA Architects and Eng'rs LLP, 963 F.3d 72, 90 (1st Cir. 2020), including "the sanctioned party's justification for the late disclosure; the opponent-party's ability to overcome its adverse effects (i.e., harmlessness); the history of the litigation; the late disclosure's impact on the district court's docket; and the sanctioned party's need for the precluded evidence." Harriman v. Hancock Cnty., 627 F.3d 22, 30 (1st Cir. 2010) (citing Esposito v. Home Depot U.S.A., Inc., 590

---

[20] Rule 26(a)(1)(A) states, pertinently: "[A] party must, without awaiting a discovery request, provide to the other parties . . . the name and, if known, the address and telephone number of each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses."
Rule 26(e)(1) states: "A party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, request for production or request for admission--must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."

F.3d 72, 76 (1st Cir. 2009)) (applying the Esposito factors to non-expert, Rule 26(a) disclosure requirements).

At the outset, Appellants' initial disclosures didn't include all discoverable information Mooney had, as required by Rule 26(a). Appellants had disclosed that the doors were tested and deemed ADA-compliant when the building was built (recall that this was Mooney's response to Darsaoui's e-mail, and that e-mail was timely disclosed to Burnett). However, Appellants waited until the eve of trial to disclose that Mooney tested the doors in 2013/2014; in fact, Appellants conceded below that they should have disclosed this information sooner. As such, the Esposito factors mainly cut against Appellants. According to Appellants, the excluded testimony was instrumental to their defense to establish that they "reasonably accommodated Burnett's disability by supplying him with handicapped accessible doors," but "[r]eversals based on a sanctioned party's need for precluded evidence are rare, and seldom based on that factor alone." Harriman, 627 F.3d at 32 (noting that reversal was warranted in one case where "the parties agreed that preclusion was tantamount to dismissal").

Citing Federal Rule of Civil Procedure 26(e), Appellants argue that Burnett was not harmed by the late disclosure because Mooney was listed as a trial witness by both parties and Burnett already knew the doors were tested. But, again, Appellants had

only disclosed to Burnett that the doors were tested and found compliant at the time the building was built, not once again in 2013/2014.

Appellants now minimize their discovery violation as a "shortcoming . . . attributable solely to [Burnett's] decision not to depose Mooney or further pursue during discovery information related to Mooney's work." This attempt to blame Burnett is unsuccessful because the Federal Rules required Appellants to timely disclose the information and Appellants' failure to do so prevented Burnett from fully preparing his case (i.e., designating an expert and testing the doors). See Esposito, 590 F.3d at 78 (noting that "the rules require formal disclosure for a reason: without it, parties . . . may be hindered in their ability to prepare effectively for trial"). Moreover, because Appellants had not disclosed Mooney's recent testing of the doors, Burnett could not have been reasonably expected to depose Mooney or pursue discovery concerning Mooney's work. Appellants further claim they were prejudiced because they had informed the jury during opening statements that Mooney was going to testify about the 2013/2014 testing of the doors, but it was Appellants' voluntary opening statement revealing surprising information which prompted Burnett's objection and which triggered the district court's discretionary ruling. Having placed themselves in this foreseeable position, Appellants cannot now complain of the

consequences.  Lastly, Appellants were at liberty to still call Mooney as a witness as long as they did not question him about his 2013/2014 testing of the doors.

In sum, the district court's decision to exclude the testimony was not an abuse of discretion, particularly when this was the "baseline" sanction and the district court did not impose additional sanctions.  Santiago-Díaz v. Laboratorio Clínico Y De Referencia Del Este, 456 F.3d 272, 276 (1st Cir. 2006).

### 3.    Closing Arguments

The third claim of error alleged by Appellants, as best we can discern, is that the district court failed to grant a new trial based on two comments made by Burnett's counsel during closing arguments.  According to Appellants, the verdict was so contrary to the weight of the evidence, there is little doubt the comments poisoned the jury.  We discuss each challenged comment in order.

### a.    Golden Rule

The first challenged comment is:

For that period of two years, he dreaded it not just the days he would go, but can you imagine -- I mean sometimes we all dread going to work, you know, after a weekend or something, but for him it was that much worse because it just was a reminder every workday that he's disabled, people are looking at me, I feel ashamed, ignored and like I don't

- 37 -

> matter, and that's exactly why we're asking
> you to award damages . . . .[21]

As mentioned, Appellants preserved this challenge at trial by interrupting counsel to lodge a "Golden Rule" (defined momentarily) objection, which the district court overruled.

Appellants now argue that this comment violated the Golden Rule and was so prejudicial that it amounted to reversible error. The "Golden Rule" prohibits attorneys from suggesting that jurors place themselves in the shoes of the plaintiff. See Granfield v. CSX Transp., Inc., 597 F.3d 474, 491 (1st Cir. 2010). Drawing from the maxim to "do unto others as you would have them do unto you," the Golden Rule prohibits jurors from treating plaintiffs the way jurors would want to be treated. This practice "has been 'universally condemned because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on evidence.'" Id. (quoting Forrestal v. Magendantz, 848 F.2d 303, 309 (1st Cir. 1988)). Though prohibited, Golden Rule arguments are not per se reversible error. See id. at 491. We consider "the totality of the circumstances, which '[f]irst and foremost [recognizes] the deference due the district court's judgment,'" id. at 490-91

---

[21] Appellants do not quote the objected-to language in their brief but instead cite page 553 of the Appendix, which contains this language. This is also the same language Appellants challenged in their post-trial motion for a new trial.

(alterations in original) (quoting Forrestal, 848 F.2d at 309), to assess the effect of counsel's comment. Other factors we consider in our totality-of-the-circumstances analysis include: "(1) the nature of the comment[]; (2) [its] frequency; (3) [its] possible relevance to the real issues before the jury; (4) the manner in which the parties and the court treated the comment[]; (5) the strength of the case; and (6) the verdict itself." Id. at 490. As a reminder, we review for abuse of discretion. See Rodríguez, 642 F.3d at 37.

We agree with Appellants that counsel's comment was an inappropriate violation of the Golden Rule. "There can be little doubt that suggesting to the jury that it put itself in the shoes of a plaintiff to determine damages is improper argument." Forrestal, 848 F.2d at 309 (directing jurors to place themselves in the shoes of plaintiff or his parents and ask themselves "if [plaintiff] were my child, what amount of money would I accept for my child to have [plaintiff's] injuries and afflictions" violated the Golden Rule); see also Granfield, 597 F.3d at 491 (asking jurors to walk in plaintiff's shoes "for just a couple of hours while you're thinking about his case" violated the Golden Rule).

Nevertheless, the totality of the circumstances does not warrant reversal. Although the nature of the comment spoke to a relevant trial issue, i.e., Burnett's pain and suffering damage claim, we note that the improper comment was brief, and counsel

- 39 -

did not again violate the Golden Rule after Appellants' objection. See Granfield, 597 F.3d at 490-91. Additionally, the district court's standard instructions that arguments by counsel are not evidence mitigated any prejudicial effect. See id. at 491. We have noted that these standard instructions can "dispel any prejudice from improper remarks." United States v. Ayala-García, 574 F.3d 5, 21 (1st Cir. 2009); see also Granfield, 597 F.3d at 491 (holding that the district court's instructions "adequately dealt with" counsel's closing arguments that violated the Golden Rule). Lastly, we consider the strength of the case and the verdict itself. See Granfield, 597 F.3d at 490. Since Burnett was the primary witness, the jury, having returned a verdict in his favor, must have found him credible. As the district judge noted, the jury "really, really liked Mr. Burnett . . . . He was self-effacing. He was not trying to gild the [lily]." Therefore, we can't say that counsel's comment swayed the verdict. See Forrestal, 848 F.3d at 310 ("[S]ince the jury here obviously believed [plaintiff's expert witness], this was not a close case. [The expert's] testimony practically compelled a verdict in favor of plaintiff."). To sum up, counsel's comment was improper, but when viewed from the totality of the circumstances vantage, it did not warrant reversal; therefore, the district court did not abuse its discretion.

### b. Suggested Damages

The second challenged comment is:

> Maybe it was just someone overlooked something, but how it felt to Ryan is why we're here and the number that you put on that, there's nothing specific that I can tell you, which I do recognize makes your job difficult, but what I can say is that we think it's significant. <u>Do we think it's, you know, 20,000, 50,000?</u> I don't know. I think it's more significant, but it's for you to decide exactly what number you would put on this period of time in his life, this [sic] two years, little over two years that he suffered this way every day unnecessarily, again because there's a law that says you can't do this and they broke that law. (Emphasis added.)

Appellants concede they did not preserve this challenge at trial. Instead, here's what happened below: The district court spontaneously raised the issue of suggested damages at sidebar at the conclusion of closing arguments. It admonished Burnett's counsel and offered to give a curative instruction, which Appellants turned down to avoid, as they put it, "calling attention to it." Appellants, who had failed to make a contemporaneous objection to counsel's comment, moved for a mistrial but instead of requesting a ruling, they asked the district court to reserve ruling until the jury reached a verdict. Appellants decided that if the jury returned a verdict of $20,000 or $50,000 in compensatory damages, they would argue the jury was unduly influenced by counsel's comment. Before the jury retired to

deliberate, the district court instructed them that their verdict must be based on the evidence and the law, which echoed its earlier standard final instructions that arguments by attorneys are not evidence, as well as its preliminary instructions that closing arguments are not evidence. When the jury returned a verdict for $150,000, Appellants renewed their motion for a mistrial, which was denied.

On appeal, Appellants argue that this comment amounted to plain error.[22] Unlike in many state courts and in other federal circuits, attorneys in the First Circuit are not permitted to suggest to the jury how much to award in damages.[23] Therefore, it's clear that Appellants have demonstrated that Burnett plainly erred. See Bielunas, 621 F.3d at 78. This case turns on whether Appellants can satisfy the third and fourth prongs, which, as a

---

[22] Appellants try to excuse their failure to contemporaneously object by saying: "(1) the issue was raised immediately after closing arguments; (2) the trial court recognized that raising the objection during closing argument only would have underscored the effect of the erroneous comments; and (3) [Appellants] moved for a mistrial before the jury began deliberations." However, Appellants don't explain why they couldn't have asked to approach the bench, something they had been allowed to do throughout the trial, and make an objection without the jury hearing it. Accordingly, our review is for plain error. See United States v. Zarauskas, 814 F.3d 509, 517 (1st Cir. 2016) (citing United States v. Sepulveda, 15 F.3d 1161, 1187 (1st Cir. 1993)) (reviewing for plain error where no contemporaneous objections were made to challenged comments in closing arguments).

[23] See Rodríguez, 642 F.3d at 37 & n.3; Bielunas, 621 F.3d at 78-79 (collecting cases and noting the First Circuit is quite out of step in this regard).

reminder, are (3) whether the error affects Appellants' substantial rights (this requires a reasonable probability that, if it wasn't for the alleged error, the verdict would have been different), and (4) whether it seriously affected the fairness, integrity, or public reputation of the trial.  See id.

Appellants have failed to show there is a reasonable probability the jury would have returned a different damage award if counsel had not suggested any ballpark figure.  As a result, Appellants have not shown prejudice.  See id. at 79 ("[P]lain error requires . . . [that] the mistake must also be prejudicial in a sense that there is a reasonable probability (not just a theoretical possibility) that it affected the result, and the result must be unjust, too." (citing United States v. Marcus, 560 U.S. 258 (2010); United States v. Padilla, 415 F.3d 211, 225 (1st Cir. 2005) (Boudin, C.J., concurring) (en banc))).  Appellants point out that the awarded damages "are precisely three times" or "significantly more than" what counsel suggested.  Though mathematically correct, this point does not advance Appellants' argument that counsel's remarks prejudiced the jury.  We might reach a different conclusion -- though we do not decide this -- if the jury had returned an award closer to $20,000 or $50,000 -- a point not lost on Appellants based on their wait-and-see strategy below.  See id. ("That the jury found Bielunas 15% comparatively

negligent as opposed to the 5% his lawyer had argued for suggests that the jury did not blindly adopt counsel's analysis.").

Even if Appellants had satisfied the third prong, Appellants have failed to show the error also seriously affected the fairness, integrity, or public reputation of the trial.  At no point during closing arguments themselves did Appellants object on this basis, even when prompted by the district court at sidebar.  What's more, Appellants declined the district court's offer for a curative instruction, even after Burnett's counsel acknowledged her mistake, apologized, and suggested the jury be given a throw-plaintiff's-counsel-under-the-bus-admonishment instruction. Against this backdrop, we cannot find that counsel's comment so swayed the jury as to unfairly prejudice Appellants, nor can we discern prejudice based on the weight of the credible evidence before the jury because, as already discussed, the evidence supported the verdict.

Moreover, the district court's standard instructions, which were reiterated to the jury right before deliberations, helped mitigate any prejudice to Appellants.  See id. at 79-80.  We highlight that Burnett's counsel's comment pales in comparison to counsel's comments in Bielunas.  See id. at 77.  There, counsel suggested a total damages figure in opening statements, then increased this total figure in closing arguments, and gave itemized figures per year (of his client's life expectancy) and category (past and future "pain and suffering," "mental anguish," and

"disability and inconvenience").  Id. at 77, 78 n.4.  Still, we held that counsel's comments did not amount to plain error given that the appellant did not object or request a curative instruction and the district court informed the jury twice that arguments by lawyers were not considered evidence.  Id. at 79-80.  Lastly, as we discuss below, Appellants do not demonstrate the award was unjust.  Accordingly, Appellants failed to satisfy the fourth and final prong, and therefore their claim does not pass the plain error test.[24]

In conclusion, Appellants' new-trial claims also fail.

## Remittitur

As a parting shot, Appellants reiterate their claim for remittitur on appeal, which is that there was no evidence that Ocean Properties had any employees or that AmeriPort had more than 100 employees, and therefore the district court was required to reduce the total award to $50,000, consistent with the corresponding statutory limit.  See 42 U.S.C. §  1981a(b)(3)(A); Me. Stat. tit. 5, §  4613(2)(B)(8)(e)(i).  Appellants ask us to

---

[24] In a last-ditch effort, Appellants also seem to argue that the comments made during closing were "in combination . . . so prejudicial" as to warrant a new trial.  Because Appellants make no detailed analysis as to why the alleged error is cumulative, we consider this argument waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[W]e see no reason to abandon the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

remand with instructions for the district court to reduce the total award to $50,000.

## Standard of Review

We review the denial of a motion for remittitur for abuse of discretion. Sánchez, 972 F.3d at 17. Given the district court's "greater familiarity with local community standards and with the witnesses' demeanor at the trial,'" we afford its decision "'broad discretion." Aponte-Rivera v. DHL Sols. (USA), Inc., 650 F.3d 803, 810 (1st Cir. 2011) (quoting Rodríguez-García v. Miranda-Marín, 610 F.3d 756, 773 (1st Cir. 2010)). "Where the trial court already has invoked its discretion in granting a remittitur, the scope of review is even narrower than usual." Id. at 810-11 (quoting Sanchez v. P.R. Oil Co., 37 F.3d 712, 724 (1st Cir. 1994)). Appellants "must show, therefore, that the reduced figure remains so extravagant as to shock the appellate conscience." P.R. Oil Co., 37 F.3d at 724 (citing Ruiz v. Gonzalez Caraballo, 929 F.2d 31, 35 (1st Cir. 1991)).

## Discussion

Appellants have failed to show the reduced damages award shocks the conscience. To the contrary, Appellants make no attempt to argue that the total award was unconscionable; instead, they argue that the award should be reduced because the evidence didn't support the jury's finding that Burnett's employer had over 500 employees (question 5 on the special verdict form). Appellants

repeat their argument that "at trial there was absolutely no evidence of an employer-employee relationship between [Appellants] and the alleged employees of those hotels, and no evidence of any ownership interest over those hotels." To refresh, Appellants are referring to the forty-five hotels and resorts marketed as "Ocean Properties Hotels, Resorts & Affiliates." This argument is related to Appellants' judgment-as-a-matter-of-law argument that there was no interrelationship between Ocean Properties and AmeriPort (which, as we already discussed, see supra pp. 12-21, was contradicted by the evidence), though slightly different (here, Appellants are challenging the interrelationship to the Ocean Properties Hotels, Resorts & Affiliates consortium). However, this argument is also contradicted by the record, which shows that all forty-five hotels and resorts were marketed on the same website, ophotels.com, and a number of them used the same Ocean Properties employee handbook, and that Darsaoui (who, as discussed, was an AmeriPort employee who also did work for Ocean Properties) processed payroll for two additional entities in the consortium, one of which was located in the same building as the clubhouse. All of this evidence supports the jury's finding that Burnett's employer had more than 500 employees. Accordingly, we find no abuse of discretion.

But wait, Appellants point to a case they claim should be dispositive here. In Escribano-Reyes v. Professional Hepa

Certificate Corp., a summary judgment case, we stated that "[t]he employment relationship is most readily demonstrated by [an] individual's appearance on the employer's payroll," 817 F.3d 380, 388 (1st Cir. 2016) (second alteration in original) (quoting Walters v. Metro. Educ. Enters., Inc., 519 U.S. 202, 206 (1997)), and given this pronouncement, Appellants say the district court should have applied the common law agency test to determine who counts as an "employee" within the meaning of the ADA.  But Appellants overlook the remainder of our discussion because a couple of sentences after the quoted passage, we clarified that "[p]ayroll records are not dispositive" and "the ultimate touchstone" is the existence of an "employment relationship[]." Id. at 388-89 (citations omitted).  In a footnote, Appellants also claim that "[b]ecause Burnett failed to produce competent evidence that OPL [Ocean Properties] employed anyone other than, allegedly, him, Burnett's claim against that entity failed as a matter of law."  These arguments, which are iterations of Appellants' judgment-as-a-matter-of-law arguments made below, are misplaced and unsupported by the record.[25]

---

[25]    Ocean Properties argued in its Rule 50(b), post-trial motion for judgment as a matter of law that Burnett "failed to put on any proof at trial that OPL had any employees; therefore, he failed to show that Ocean Properties met the fifteen-employee requirement for application of Title VII and the ADA."  The district court considered the argument waived because it was not raised in the parties' Rule 50(a) motion.  On the merits, discussing Escribano and the common law agency test, the district

- 48 -

In sum, Appellants' remittitur claim also fails.

**CONCLUSION**

We **<u>affirm</u>** in all respects, with costs to Burnett.

---

court found that Burnett failed to establish that Ocean Properties met the fifteen-employee minimum. The district court's analysis did not end there, however, as it then aggregated the number of employees at AmeriPort and Ocean Properties based on evidence of the interrelationship of the parties to conclude that "the jurisdictional threshold of fifteen or more employees has been met as to Ocean Properties through the principle of aggregation."